USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12-19-14

**UNITED STATES DISTRCIT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CARMEN REYES,                                :

                                Plaintiff,   :        **REPORT AND**
                                             :        **RECOMMENDATION**
                - against -                   :
                                             :        **13-CV-4683 (WHP) (RLE)**
CAROLYN COLVIN,                              :
**Acting Commissioner of Social Security,**  :
                                             :
                                Defendant.   :

**TO THE HONORABLE WILLIAM H. PAULEY:**

## I. INTRODUCTION

Plaintiff Carmen Reyes ("Reyes") commenced this action under the Social Security Act ("Act"), 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3), challenging the Commissioner of Social Security's ("Commissioner") final decision denying her claim for disability benefits. Reyes argues that the decision of the Administrative Law Judge ("ALJ") was not supported by substantial evidence, and contrary to the law. On February 14, 2014, Reyes moved for a judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, asking the Court to reverse the decision of the Commissioner and remand for further administrative proceedings. (Mem. of Law in Supp. of Pl.'s Mot. For J. on the Pleadings ("Pl. Mem.") at 1, 22.) On April 25, 2014, the Commissioner cross-moved for judgment on the pleadings, asking the Court to affirm the Commissioner's decision and dismiss the Complaint. (Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings ("Def. Mem.") at 1.) For the reasons that follow, I recommend that Reyes's motion be **GRANTED**, the Commissioner's motion be **DENIED**, and that the case be **REMANDED** for further administrative proceedings.

## II. BACKGROUND

### A. Procedural History

Reyes filed her application for Supplemental Security Income ("SSI") benefits on April 21, 2008.[1] (Tr. of Admin. Proceedings ("Tr.") at 135.) In her SSI application, Reyes stated that her disability began on June 1, 2004, and resulted from high blood pressure, hypothyroidism, anemia, post-traumatic stress disorder ("PTSD"), general anxiety disorder, panic disorder without agoraphobia,[2] major depressive disorder, severe headaches, chest pain, asthma, and blurred vision. (Tr. at 147.) The Social Security Administration ("SSA") denied her application on June 20, 2008, and Reyes requested a hearing before an ALJ on July 24, 2008. (*Id.* at 50, 110.) Reyes appeared before ALJ Seth I. Grossman (the "ALJ") on February 12, 2010, and was represented by counsel. (*Id.* at 53-108.) At the hearing, the ALJ issued a subpoena for additional evidence from Reyes's treating physicians. (*Id.* at 47, 87-88, 106-08.) The ALJ issued a decision on April 15, 2011, finding that Reyes was not disabled within the meaning of the Act and was not entitled to disability insurance benefits. (*Id.* at 29.) Reyes requested review by the Social Security Appeals Council on April 29, 2011. (*Id.* at 28.) On May 16, 2013, the ALJ's decision became the Commissioner's final decision when the Social Security Appeals Council denied Reyes's request for review. (*Id.* at 1.) Reyes filed this action on July 8, 2013. (Doc. No. 2.)

---

[1] Reyes was given a protective filing date of March 31, 2008. (Tr. at 155.) If certain criteria are met, a claimant may establish an application date on the date the Social Security Administration receives a written statement of intent to file for benefits or an oral inquiry about benefits. This process is referred to as protective filing. *See* 20 C.F.R. §§ 416.340, 416.345.

[2] Agoraphobia is an intense, irrational fear of open spaces, characterized by a significant fear of going out alone or of being in public spaces where escape would be difficult or help might be unavailable. *Dorland's Illustrated Medical Dictionary*, 40 (32nd ed. 2011).

### B. The ALJ Hearing

#### 1. Reyes's Testimony at the Hearing

Reyes was born on December 4, 1958. (Tr. at 135.)  She advanced to the twelfth grade but did not graduate high school because she became pregnant and could not pass the required exams.  (*Id.* at 71.)  She reads and understands English.  (*Id.*)  Reyes last worked in 2005 at a job that involved "picking up trash," but was not sure of the date.  (*Id.* at 96.)  She spent her days watching television and did not socialize because she did not like to be around people.  (*Id.* at 67.)  She stayed at home except to attend appointments and to visit her mother.  (*Id.* at 73-75.)  In addition, Reyes stopped cooking because her forgetfulness caused her to burn food.  (*Id.* at 89.)  Her daughter helped by cleaning and going shopping with her.  (*Id.* at 74, 89.)  Reyes arrived at the hearing by bus, and did not like to take the train.  (*Id.* at 73.)  When asked by her attorney what caused her PTSD, she began to cry.  (*Id.* at 94-95.)  Reyes was on medication for her sleep disorder, thyroid condition, anemia, and high blood pressure.  (*Id.* at 89-90.)  She had no problem lifting things, and could walk a mile.  (*Id.* at 93.)  When asked if she could concentrate on a simple task for two hours at a time, Reyes stated that she thought she could but was not sure.  (*Id.* at 104.)  She stated that she "forget[s] everything."  (*Id.* at 105.)  When asked about hallucinations, Reyes testified that she sometimes saw things that were not there.  (*Id.* at 82.)

#### 2. Medical Evidence[3]

##### a. Raihana Khorasanee, M.D., Psychiatrist at Metropolitan Hospital (July 2005 – June 2006)

Reyes met with Dr. Raihana Khorasanee, a psychiatrist, at Metropolitan Hospital twice in 2005 and once in 2006.  (Tr. at 458.)  At her first visit, Reyes complained that she had trouble

---

[3] Other physicians had previously treated Reyes at Metropolitan Hospital, but because there is an abundance of medical evidence concerning Reyes's conditions, only the most salient medical evidence is discussed.

sleeping, was irritable, and did not get along with others. (*Id.*) Reyes had been taking Prozac[4]

for depression and Atarax[5] for anxiety, but was not compliant with the Atarax. Dr. Khorasanee

discontinued the Atarax and replaced it with Trazodone.[6] (*Id.*) At her next visit, Reyes claimed

she still could not sleep well; Dr. Khorasanee discontinued the Trazadone and replaced it with

Ambien.[7] (*Id.* at 459.) At her last visit in June 2006, Reyes felt well and did not think that she

needed medication, even though she felt anxiety from time to time and had trouble sleeping. (*Id.*

at 459-60.) Dr. Khorasanee prescribed Atarax to treat her anxiety and sleep troubles. (*Id.* at

460.) Dr. Khorasanee also discontinued Prozac, Trozadone, and Ambien because Reyes had

stopped taking those medications for over six months. (*Id.*)

### b. Hashim Raza, M.D., Psychiatry Resident at Metropolitan Hospital (July 2006 – February 2007)

Dr. Hashim Raza, a psychiatry resident, saw Reyes four times at Metropolitan Hospital

between July 13, 2006, and February 16, 2007. (Tr. at 460-64.) On the date of Reyes's last visit,

Dr. Raza filled out a psychiatric report in which he only listed PTSD as Reyes's "presenting

problem." (*Id.* at 510.) He also noted that he had prescribed Prozac, Atarax, and Ambien. (*Id.*)

Based on Reyes's most recent visit, Dr. Raza noted that Reyes was cooperative and attentive, had

"good" insight and judgment, as well as grossly organized speech. (*Id.* at 510-11.) He also

stated that Reyes showed anxiety around people, had difficulty communicating, and was

---

[4] Prozac is a drug that treats depression, obsessive-compulsive disorder, and other disorders. U.S. National Library of Medicine, *Fluoxetine,* PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010346/ (last visited Nov. 21, 2014).

[5] Atarax is a drug that treats anxiety, tension, nervousness, and other disorders. U.S. National Library of Medicine, *Hydroxyzine Pamoate*, PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010631/ (last visited Nov. 21, 2014).

[6] Trozadone is a drug that treats depression. U.S. National Library of Medicine, *Trazodone,* PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012504/ (last visited Nov. 21, 2014).

[7] Ambien is a drug that is used to treat insomnia. U.S. National Library of Medicine, *Zolpidem,* PUBMED HEALTH, http://www.ncbi.nl m.nih.gov/pubmedhealth/PMHT0001948/ (last visited Nov. 21, 2014).

depressed and tearful.  (*Id.* at 511-12.)  In response to questions concerning the effect of Reyes's

impairments on her ability to perform work-related activities, Dr. Raza assessed that Reyes's

ability to understand, remember, and carry out simple instructions was not affected, but that her

ability with respect to detailed instructions was "moderately" affected.  (*Id.* at 514.)  Dr. Raza

stated that Reyes was "markedly" affected in her ability to interact appropriately with

supervisors, co-workers, and the public.  (*Id.* at 515.)  He also noted that Reyes had a "marked"

limitation in her ability to respond appropriately to work pressures and changes in a routine work

setting.  (*Id.*)  In support of these assessments, Dr. Raza explained that Reyes "suffers from

PTSD and has difficulty concentrating when under stress or having panic attacks."  (*Id.* at 514.)

He also noted that Reyes "has had problems working with the public" and with "expressing her

emotions inappropriately."  (*Id.* at 515.)

### c. Uko Okpok, M.D., Internist at Federal Employment and Guidance Service (November 2007)

In November 2007, Reyes underwent a biopsychosocial ("BPS")[8] evaluation at the

Federal Employment and Guidance Service ("FEGS").  (Tr. at 315.)  Reyes stated that doctors

previously treated her for depression and prescribed Ambien, Prozac, and Hydroxyzine,[9] but she

did not take the medication as directed.  (*Id.* at 402.)  Reyes reported that she was unable to work

because she experienced panic attacks whenever she was around a lot of people.  (*Id.* at 403.)

On the Patient Health Questionnaire-9, a screening tool that relies on patient self-reporting,

Reyes scored within the range of "normal or minimal depressive symptoms."  (*Id.* at 411.)

---

[8] A BPS is a screening device that is not intended to be solely relied upon in diagnosing a depressive disorder.  (Tr. at 411.)  Because this device relies on patient self-reporting, "…a definite diagnosis must be verified by a clinician, taking into account how well the patient understood the questions, as well as other relevant information."  (*Id.*)

[9] Hydroxyzine is a drug that treats anxiety, tension, nervousness, and other disorders. U.S. National Library of Medicine, *Hydroxyzine Pamoate*, PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010631/ (last visited Nov. 21, 2014).

Reyes stated that she was able to perform all of the listed daily activities, including household cleaning and personal grooming. (*Id.* at 403.) Reyes underwent a psychiatric evaluation and was diagnosed with hypertension, hypothyroidism, anemia, PTSD, generalized anxiety disorder, panic disorder without agoraphobia, and major depressive disorder. (*Id.* at 414-21.) She told an FEGS social worker that she could travel independently by bus or train. Dr. Uko Okpok noted, however, that Reyes was unable to travel by train because of her general anxiety disorder and panic disorder. (*Id.* at 402, 409.) Under the section titled "Employment Disposition," Dr. Okpok indicated that he was unable to make a functional capacity assessment without further treatment. (*Id.* at 408.)

### d. Omar Gutierrez, M.D., Psychiatrist at Morrisania Neighborhood Family Care Center (January – March 2008)

Dr. Omar Gutierrez, a psychiatrist, saw Reyes three times, beginning January 15, 2008. (Tr. at 439.) At this first visit, Reyes reported that she had been suffering from depression for the past nine years. (*Id.*) Dr. Gutierrez described Reyes in his psychiatric evaluation notes as "neat," "well groomed," "feeling rather anxious," "irritable," "depressed," "apathetic," and an "insomniac." (*Id.*) He also noted that Reyes's speech was logical, and her mood and affect were "essentially appropriate and consistent with her ideation." (*Id.*) Dr. Gutierrez diagnosed Reyes with major depressive disorder without psychotic features, and prescribed Prozac, Atarax, and Ambien. (*Id.*)

Reyes met with Dr. Gutierrez again on January 28, 2008. The doctor noted that she was "[f]eeling less anxious [and] sleeping better, but still rather depressed." (Tr. at 440.) That same day, at the request of FEGS, Dr. Gutierrez filled out a form titled "Treating Physician's Wellness Plan Report," in which he indicated that Reyes was unable to work for at least twelve months. (*Id.* at 517.) The doctor listed general anxiety disorder, major depressive disorder, and PTSD

under "current diagnoses," and explained that Reyes "suffers [from] the inability to concentrate and to understand [and] to follow instructions as well as significant memory deficits as a result of her condition." (*Id.* at 516-17.) Dr. Gutierrez also stated that Reyes's symptoms had been "present on [and] off for [the] past fifteen years" and had been "treated with [medication] intermittently." (*Id.* at 516.) In response to a question that asked if the condition had been resolved or stabilized, Dr. Gutierrez stated that it was too early for Reyes to respond to treatment. (*Id.* at 517.)

At Reyes's third visit on March 24, 2008, Dr. Gutierrez noted that Reyes was "feeling less depressed and sleeping better," appeared "more animated," and was now "smiling rather broadly." (Tr. at 440.) He concluded that Reyes was "stabilizing." (*Id.*) On April 21, 2008, Reyes filed her application for SSI. (*Id.* at 135.)

### e. Catherine Pelczar-Wissner, M.D., Internist at Industrial Medicine Associates, P.C. (June 2008)

On June 9, 2008, Dr. Catherine Pelczar-Wissner, an internist, conducted an internal medicine examination as part of a Social Security Consultative Examination. (Tr. at 465.) Reyes stated that she did not clean, shop, or do laundry because she suffered from fatigue. (*Id.* at 466.) Reyes also stated that she did not cook because she could not see, which caused her to burn food. (*Id.*) In addition, Reyes maintained that her depression was overwhelming at times, leaving her with no desire to get out of bed. (*Id.* at 465.) Dr. Pelczar-Wissner concluded that Reyes should be "restricted from activities requiring marked exertion" because Reyes suffered from fatigue as a result of her anemia and hypothyroidism. (*Id.* at 468.) Additionally, she stated, "For the rest of the objective limitations for her activities of daily living[,] [I] will defer to psychiatry." (*Id.* at 468.)

7

### f. Dmitri Bougakov, Ph.D., Psychologist at Industrial Medicine Associates, P.C. (June 2008)

On June 9, 2008, Dr. Dmitri Bougakov, a psychologist, conducted a psychiatric evaluation of Reyes as part of the Social Security Consultative Examination. (Tr. at 469.) Reyes complained of crying spells, sad moods, loss of interest, irritability, low energy, concentration difficulties, and social withdrawal. (*Id.*) She also reported having PTSD caused by having previously served a three-year probation sentence for drug possession in connection with drugs that belonged to her partner. (*Id.*) Reyes further stated that she was able to dress, bathe, and groom herself, and take the bus for transportation, but that she was uncomfortable around people and crowds and had difficulties concentrating. (*Id.* at 470-01.) She claimed that she occasionally drank wine or beer at parties. (*Id.*) She reported that she sometimes "space[d] out" causing her to burn food, and suffered from poor sleep, though her medication helped. (*Id.* at 469-70.)

Based on the mental status examination, Dr. Bougakov found that Reyes was cooperative, expressed herself adequately, and maintained appropriate eye contact. (Tr. at 470.) He noted that Reyes's thought process was "coherent and goal directed," and that her affect was of "full range and appropriate in speech." (*Id.*) He also noted that Reyes's mood was "dysthymic,"[10] and her sensorium was "clear."[11] (*Id.*)

In conclusion, Dr. Bougakov found that Reyes was "mildly" impaired with respect to her attention, concentration, and memory skills. (Tr. at 470-71.) With respect to her cognitive functioning, he noted that Reyes's intellectual functioning was "below average." (*Id.* at 471.)

---

[10] Dysthymic means mildly depressed. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 582 (32nd ed. 2011).

[11] Sensorium refers to a person's mental state judged in terms of their ability to interpret sensory information. *See* MERRIAM-WEBSTER'S MEDICAL DICTIONARY (2006), *available at* http://www.merriam-webster.com/medical/sensorium.

8

He also noted that her insight and judgment were "fair." (*Id.*) Dr. Bougakov diagnosed Reyes with depressive disorder, anxiety disorder, and hypothyroid problems. (*Id.* at 472.) He concluded:

> [Reyes] can follow and understand simple directions and instructions, performing simple tasks independently, and maintain attention and concentration, possibly maintain a regular schedule, and learn new tasks on a limited basis. She cannot perform complex tasks independently. She can make appropriate decisions, relate adequately with others, and deal with stress on a limited basis. Her difficulties are caused by psychiatric symptomatology. Results of the examination appear to be consistent with some psychiatric problems, but in and of itself this does not appear to be significant enough to interfere with claimant's ability to function on a daily basis.

(*Id.* at 471.)

### g. Z. Mata, Psychiatric Consultant at the New York State Office of Temporary and Disability Assistance (June 2008)

On June 18, 2008, Dr. Z. Mata, a non-examining psychiatric consultant for the New York State Office of Temporary and Disability Assistance, completed a mental residual functional capacity assessment of Reyes based on evidence in the record. (Tr. at 488.) He concluded that Reyes was not "markedly" limited in any of the activities listed under the four main categories: understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (*Id.* at 488-89.) Dr. Mata concluded, however, that Reyes was "moderately" limited in activities concerning her ability to handle detailed instructions, to maintain concentration for an extended period of time, and to work appropriately with others. (*Id.*) Dr. Mata concluded that "[Reyes] retains the capacity to perform entry level work in a low interactive setting." (*Id.* at 490.) Additionally, Dr. Mata completed a psychiatric review technique where he assessed Reyes's medical evidence to determine if she had an impairment that met or medically equaled one of the listed impairments under C.F.R. Part 404, Subpart P, Appendix 1. Dr. Mata concluded that the degree of Reyes's functional limitations was not severe enough to satisfy the

criteria set forth in "Paragraph B" of the relevant listings, and that the evidence did not establish the presence of "Paragraph C" criteria.[12]  (*Id.* at 483-84.)

### h. Anna Alayeva, M.D., Psychiatrist at Metropolitan Hospital (September 2009 – February 2010)

After she appealed her initial denial of benefits in July 2008, Reyes met with Dr. Anna Alayeva, a psychiatrist, on two occasions for psychiatric attention. (Tr. at 50, 563, 568.) Dr. Alayeva first saw Reyes on September 10, 2009, where she noted that Reyes was slightly sad, but cooperative. (*Id.* at 568.) Reyes reported that her medication did not help because she still felt depressed and was unable to sleep. (*Id.*) Dr. Alayeva noted that Reyes had stopped taking her Celexa[13] and had missed two previously scheduled appointments. (*Id.*) She also noted that Reyes's mood was "sad" and that her affect was appropriate in relation to her mood. (*Id.*) Dr. Alayeva further noted that Reyes's positive mental attitude ("PMA") was normal and that her impulse control, judgment, and insight were "fair." (*Id.*) Additionally, she reported that Reyes's cognition and memory were "grossly intact," and that she was "alert/oriented" in time, place, and person. (*Id.*) Reyes denied having any suicidal or homicidal ideations or any hallucinations. (*Id.*) Dr. Alayeva diagnosed PTSD by history and indicated that major depressive disorder should be ruled out.[14]  (*Id.*) She discontinued Celexa and prescribed Seroquel.[15]  (*Id.*)

---

[12] The ALJ is responsible for deciding the ultimate legal question of whether a listing is met or medically equaled. *See* SSR 96-6p, 1996 WL 374180 (1996). This determination is explained below in further detail.

[13] Celexa is a drug that is used to treat depression. U.S. National Library of Medicine, *Citalopram,* PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009639/ (Nov. 21, 2014).

[14] Where a physician suspects that a condition may be present, but lacks sufficient information to make a final diagnosis, a physician may write "rule out" to indicate that further evaluations are needed to determine if the condition in question is present or not. *See Definition of Rule Out,* MEDICINENET, http://www.medicinenet.com/script/main/art.asp?articlekey=33831 (last visited Nov. 21, 2014).

[15] Seroquel is a drug that is used to treat schizophrenia, bipolar disorder, or depression. U.S. National Library of Medicine, *Quetiapine,* PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009639/ (last visited Nov. 21, 2014).

Reyes failed to attend her follow-up appointment on October 7, 2009. (Tr. at 568.) On November 9, 2009, Dr. Alaycva completed an SSA form titled "Medical Source Statement of Ability to do Work-Related Activities (Mental)." (*Id.* at 498.) Dr. Alayeva reported that Reyes was "moderately" limited in her ability to understand, remember, and carry out complex work instructions, and "mildly" limited in her ability to make judgments on complex work decisions. (*Id.*) In support of these assessments, she stated that Reyes suffered from PTSD, anxiety, crying spells, flashbacks, and had difficulty concentrating. (*Id.*) She also stated that Reyes suffered from poor sleep and could not stay in crowded spaces. (*Id.*)

Dr. Alayeva also reported that Reyes had a "marked" limitation in her ability to interact appropriately with supervisors, co-workers, and the public. (Tr. at 499.) She stated that Reyes had a "marked" limitation in her ability to respond appropriately to usual work situations and to changes in a routine work setting. (*Id.*) Dr. Alayeva, however, did not include any findings or factors to support her assessment in the space provided on the form. (*Id.*) She also stated that Reyes did not have any other capabilities that were affected by her impairments. (*Id.*)

Dr. Alayeva saw Reyes for the second time on February 3, 2010. (Tr. at 563.) At this visit, Reyes reported feeling better on her current medication, but complained of being sad and getting poor sleep. (*Id.*) Dr. Alayeva noted that Reyes was calm, cooperative, and pleasant. (*Id.*) Her clinical findings concerning Reyes's mental status and diagnosis did not change from those in September 2009. (*Id.*)

Four days prior to Reyes's hearing before the ALJ, Dr. Alayeva completed an SSA form titled "Report for Claim of Disability Due to Mental Impairment" on February 8, 2010. Dr. Alayeva wrote that Reyes's diagnoses were major depressive disorder, PTSD, hypothyroidism, and hypertension. (Tr. at 502.) In describing Reyes's symptoms, she stated that Reyes was

11

depressed, hopeless, helpless, hypervigilant, anxious, and had episodes of crying spells. (*Id.* at 503.) Dr. Alayeva went on to state that Reyes suffered from nightmares, poor sleep, and flashbacks. (*Id.*) Compared to her clinical findings in September 2009, she added that Reyes was hypervigilant and described Reyes's mood as "depressed" instead of "sad." (*Id.*) Dr. Alayeva also stated that, although Reyes's cognition and memory were "grossly intact," she had "decreased concentration and attention." (*Id.*) Furthermore, Dr. Alayeva stated that Reyes could travel by bus, but not by subway because she was unable to stay in closed spaces, became anxious and fearful, and had difficulty breathing. (*Id.* at 504.)

In describing the degree of Reyes's functional limitations caused by her mental disorder, Dr. Alayeva concluded that: (1) Reyes was "moderately" limited in her ability to perform activities of daily living; (2) "markedly" limited in her ability to maintain social functioning, sustain concentration, persistence, or pace;[16] and (3) suffered from repeated episodes[17] of deterioration or decompensation.[18] (Tr. at 505-06.) Specifically, she stated that Reyes had a "marked" limitation in her ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work closely with others without being distracted; complete a normal workday or workweek; interact appropriately with the general public, co-workers, or peers; behave appropriately; be neat and clean; be aware of

---

[16] Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long enough to permit the timely and appropriate completion of tasks commonly found in work settings. C.F.R. Part 404, Subpart P, Appendix 1 §12.00 (C)(3).

[17] The phrase "repeated episodes of decompensation, each of extended duration" in these listings means three episodes within one year, or an average of once every four months, each lasting for at least two weeks. C.F.R. Part 404, Subpart P, Appendix 1 §12.00 (C)(4).

[18] Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. C.F.R. Part 404, Subpart P, Appendix 1 §12.00 (C)(4).

normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation. (*Id.* at 507-09.)

### i. Clifford Gimenez, M.D., Psychiatric Resident at Metropolitan Hospital (May – December 2010)

Dr. Clifford Gimenez, a psychiatric resident, met with Reyes for fifteen minutes on May 19, 2010. (Tr. at 560-61.) Similar to Reyes's previous physicians, Dr. Gimenez noted that Reyes was calm, cooperative, pleasant, and appropriately dressed and groomed. (*Id.*) Reyes reported feeling "good" on her current medication with "no recent stressors," but she continued to struggle with poor sleep. (*Id.*) Dr. Gimenez's clinical findings concerning Reyes's mental status were consistent with Dr. Alayeva's clinical findings contained in her treatment notes. (*Id.*) Dr. Gimenez found that Reyes's mood was "sad"; her affect was appropriate in relation to her mood; her PMA was normal; and her impulse control, judgment, and insight were "fair." (*Id.*) Reyes's cognition and memory were "grossly intact," and she was "alert/oriented" in time, place, and person. (*Id.*) Reyes denied having any suicidal or homicidal ideations as well as any hallucinations. (*Id.*) Dr. Gimenez diagnosed Reyes with PTSD by history and indicated that major depressive disorder should be ruled out. (*Id.*)

On December 23, 2010, Dr. Gimenez completed an SSA form titled "Report for Claim of Disability Due to Mental Impairment." (Tr. at 617.) He reported that Reyes's diagnoses were PTSD, hypertension, hypothyroidism, chronic anemia, and chronic mental illness. (*Id.*) Dr. Gimenez also indicated that Reyes was "markedly" limited in her ability to maintain social functioning and to sustain concentration, persistence, or pace. (*Id.* at 620-21.) He also noted that Reyes suffered from continual episodes of deterioration or decompensation. (*Id.* at 621.) Specifically, Dr. Gimenez stated that Reyes was "extremely" limited in her ability to: manage detailed instructions; maintain attention and concentration for extended periods; and sustain an

13

ordinary routine without supervision. (*Id.* at 622.) He also found her to be "markedly" limited in her ability to: handle short and simple instructions; maintain a schedule; make simple work-related decisions; ask simple questions or request assistance; and set realistic goals or independently make plans. (*Id.* at 622-24.) Dr. Gimenez went on to state that Reyes was "extremely" limited in her ability to: complete a normal workday or workweek; go without an unreasonably lengthy rest period; interact appropriately with others; respond appropriately to changes in a work setting; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation. (*Id.* at 622-24.) In describing his clinical findings, Dr. Gimenez stated, among other things, that Reyes's mood was "depressed" and her impulse control was "impaired." (*Id.* at 618.) He also noted that Reyes was currently taking Zoloft[19] and Ambien. (*Id.* at 619.) Although Dr. Gimenez marked "no" where the question asked if Reyes would have difficulty traveling alone by bus or subway, in the space provided for an explanation of a "yes" answer, he wrote that she suffered from hypervigilance and anxiety in closed spaces. (*Id.*)

### j. Edward Hoffman, Ph.D., Psychologist, Social Security Consultative Examiner (February 2011)

On February 2, 2011, Dr. Edward Hoffman, a psychologist, conducted an additional Social Security Consultative Examination of Reyes as requested by the ALJ. (Tr. at 628.) Reyes reported to Dr. Hoffman that she arrived alone by subway and felt depressed. (*Id.* at 628.) Reyes also stated that she suffered from poor sleep and frequent nightmares. (*Id.*) With respect to her daily activities, Reyes reported that she cooked on occasion, did not do laundry, shopped only with her daughter, showered independently, and did not take the subway independently.

---

[19] Zoloft is a drug that is used to treat depression, anxiety, and other disorders. U.S. National Library of Medicine, *Sertraline*, PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012108/ (last visited Nov. 21, 2014).

14

(*Id.* at 630.) Based on these statements, Dr. Hoffman found that Reyes showed "somewhat impaired adaptive functioning and impaired socialization skills." (*Id.*) He stated that Reyes cooperated during the questioning section of the mental status examination, but was uncooperative during the cognitive testing section. (*Id.* at 628-29.) He, therefore, was unable to make any determinations with respect to any cognitive impairment, but did find that the examination, in conjunction with Reyes's treatment history, supported her alleged psychiatric problems. (*Id.* at 630.) Dr. Hoffman diagnosed Reyes with "learning problems by history, with depressive features," as well as hypertension, thyroid disorder, and visual problems. (*Id.*) He noted that Reyes's mood was "somewhat anxious, but stable" and that her affect was "somewhat constricted." (*Id.* at 629.) Dr. Hoffman also noted that Reyes showed "adequate" speech and thought process, inadequate impaired memory skills, "guarded" insight and judgment, and inadequate attention and concentration because of her lack of motivation and a clear sensorium. (*Id.*) He concluded that Reyes could perform simple, repetitive tasks, relate adequately to others, learn new "rote" tasks, maintain attention and concentration for "rote" tasks, and follow a routine and schedule with supervision. (*Id.* at 630.)

### k. Jorge Kirschtein, M.D., Psychiatrist at Federal Employment and Guidance Service (April 2011)

After her claim had been denied by the ALJ, Reyes underwent an additional BPS evaluation at FEGS with Dr. Jorge Kirschtein, a psychiatrist, on April 26, 2011. (Tr. at 658.) At the evaluation, Dr. Kirschtein noted that Reyes displayed a depressed mood and cried during twenty-five percent of the interview. (*Id.* at 659.) Based on his interview with Reyes, Dr. Kirschtein concluded that she suffered from depression which was present for "5/7 days" for more than half of the day, as well as "sad mood, social isolation, poor concentration, low energy, disturbed sleep, disturbed appetite, helplessness, worthlessness, guilt, and distractibility." (*Id.*)

Concerning Reyes's anxiety issues, Dr. Kirschtein noted that she had "generalized excessive worry," which was present for "5/7 days" for several hours per day, and experienced panic attacks. (*Id.*) He also noted that Reyes denied any auditory or visual hallucinations. (*Id.*) Dr. Kirschtein concluded that Reyes was "severely" limited in her ability to follow work rules, deal with the public, relate to co-workers, and adapt to stressful situations. (*Id.* at 660.) Reyes was also found to have a "moderate" limitation in her ability to accept supervision, maintain attention, and adapt to change. (*Id.*) The doctor assessed PTSD with panic features and major depression. (*Id.* at 661.) Dr. Kirschtein opined that these conditions presented a severe vocational impairment rendering Reyes unable to work. (*Id.*)

### l. Daniel Cohen, M.D., Psychiatrist at Metropolitan Hospital (November 2012 – April 2013)

On April 29, 2013, Dr. Daniel Cohen, a psychiatrist, completed a psychiatric impairment questionnaire in which he stated that he treated Reyes on a weekly basis from November 13, 2012, to April 9, 2013. (Tr. at 8.) Dr. Cohen diagnosed, among other things, major depressive disorder, and stated that Reyes was "markedly" limited in her ability to sustain concentration and persistence, to interact socially in an appropriate manner, to adapt to changes in the work setting, and to use public transportation. (*Id.* at 8-13.) In support of his diagnosis, Dr. Cohen checked off an array of psychological symptoms related to depression, anxiety, and other disorders. (*Id.* at 9.)

### 3. The ALJ's Decision

On April 15, 2011, ALJ Seth I. Grossman issued his decision that Reyes was not disabled within the meaning of §1614(a)(3)(A) of the Social Security Act, and had not been disabled since March 31, 2008, the date her application was protectively filed. (Tr. at 35.) Although the ALJ determined that Reyes's impairments were severe, he determined that she retained the residual

functional capacity ("RFC") to perform "medium" work as defined in 20 C.F.R. 416.967(c) except she could only perform simple, routine, repetitive tasks. (*Id.* at 38.) The ALJ concluded that Reyes's RFC, when considered together with her age, education, and work experience, rendered her capable of performing a significant number of existing jobs in the national economy, and thus, not disabled. (*Id.* at 38-43.)

The ALJ applied the required five-step sequential analysis. 20 C.F.R. § 416.920(a)(4). At step one, the ALJ determines whether the claimant is engaged in substantial gainful activity. If the claimant is found to be doing such an activity, she will be found not disabled. 20 C.F.R. § 416.920(a)(4)(i). The ALJ found at step one that Reyes had not engaged in substantial gainful activity since March 31, 2008. (Tr. at 37.) At step two, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental impairment (or combination of impairments) that meets the duration requirement in § 416.909, she will be found not disabled. 20 C.F.R. § 416.920(a)(4)(ii). The ALJ found that Reyes had the following severe impairments: hypertension, hypothyroidism, depression, and PTSD. (*Id.*) At step three, the ALJ considers the medical severity of the claimant's impairment(s) in determining whether the impairment(s) meets or equals one of the listings in C.F.R. Part 404, Subpart P, Appendix 1. A positive match directs a finding of disability. 20 C.F.R. § 416.920(a)(4)(iii). The ALJ determined that Reyes did not have an impairment or combination of impairments that met or medically equaled the criteria of one of the listed impairments in Appendix 1 of the regulations. (*Id.*) The ALJ explained that Reyes's hypertension and hypothyroidism failed to meet the criteria of any listing, including Listings 4.00, cardiovascular impairments, and Listing 9.00, endocrine disorders, because both impairments were controlled by medication and Reyes did not testify to experiencing any

17

symptoms resulting from these impairments. (*Id.*) With respect to Reyes's depression and

PTSD, the ALJ stated that these impairments failed to satisfy the "Paragraph B" criteria of

Listings 12.04 and 12.06 because they did not "cause at least two 'marked' limitations or one

'marked' limitation and 'repeated' episodes of decompensation, each of extended duration." (*Id.*

at 37-38.) The ALJ also considered whether the evidence satisfied "Paragraph C" criteria, but

determined that it did not. (*Id.*)

In determining Reyes's RFC, the ALJ evaluated the extent to which Reyes's symptoms

limited her ability to function in light of the objective medical evidence as well as other evidence

as defined by SSA regulations. The ALJ determined that while Reyes's impairments could

reasonably be expected to cause the alleged symptoms, her statements concerning the intensity,

persistence, and limiting effects of these symptoms were not credible. (Tr. at 38, 40.)

First, the ALJ found that Reyes's physical impairments, hypothyroidism and

hypertension, appeared to be asymptomatic because Reyes did not testify to any limitations

caused by these disorders, nor did treatment records show any residual effects. (Tr. at 40.)

Second, with respect to Reyes's mental impairments, the ALJ gave little weight to the opinions

of Reyes's treating physicians, Dr. Gutierrez, Dr. Alayeva, and Dr. Gimenez, who stated that she

had several "marked" functional limitations. (Tr. at 41.) The ALJ found that Dr. Gutierrez and

Dr. Alayeva had a lack of treatment history with Reyes in that they made their assessments after

having only treated her twice each. (*Id.*) As for Dr. Gimenez, the ALJ found no accompanying

treatment records that supported his opinion.[20] (*Id.*) The ALJ also gave little weight to Dr.

Gutierrez and Dr. Alayeva because he found that their respective treatment notes were

inconsistent with their opinions regarding Reyes's limitations. (*Id.*) For example, the ALJ

---

[20] The record does in fact show treatment notes from one visit with Dr. Gimenez on May 19, 2010. (Tr. at 560.)

found an inconsistency where Dr. Gutierrez stated in a January 2008 report that Reyes was unable to work, while on the same day, noted that it was too early for Reyes to respond to treatment, and that Reyes was feeling less anxious and depressed.[21]  (Id.)  Similarly, the ALJ found an inconsistency with Dr. Alayeva's opinion where she indicated in a November 2009 report and a February 2010 report that Reyes had significant limitations in performing work activities, and had "marked" limitations in her ability to interact socially, and to concentrate, persist, or maintain pace.  The ALJ found these assessments inconsistent with Dr. Alayeva's own treatment records because such limitations were not mentioned in them, and "instead show a relatively benign mental status examination."  (Id.)

Moreover, the ALJ stated that he did not find Reyes credible because of her reported lack of cooperation and motivation during the February 2011 consultative psychiatric evaluation with Dr. Hoffman, and several inconsistent statements made by Reyes in the record.  (Tr. at 41.)  Specifically, the ALJ highlighted the following inconsistencies:

- Reyes reported that she traveled by train when she attended the 2008 and 2011 consultative examinations despite having previously claimed that she was unable to travel by train.
- Reyes reported that she had attended special education classes as a child during her February 2011 consultative examination, even though she previously stated that she had attended regular classes as a child at her 2008 consultative examination, her initial disability application in 2008, and her November 2007 FEGS interview.
- Reyes claimed that she was uncomfortable around people, yet in the same 2008 consultative interview, she also claimed that she occasionally drank alcoholic beverages at parties.
- Reyes indicated that she saw things that were not actually there during the hearing, while the treatment records did not show any evidence of hallucinations.

(Id.)

---

[21] Dr. Gutierrez stated that Reyes felt less depressed on March 2008, not in the January 2008 report.  (Tr. at 440.)

The ALJ instead relied on the findings of Dr. Bougakov, who found that Reyes was capable of performing work that consisted of simple directions and instructions despite her mental impairments. (Tr. at 42.) The ALJ therefore determined that Reyes had the RFC to perform medium work limited to simple, routine, repetitive tasks. (*Id.* at 38.)

At step four, the ALJ considered Reyes's RFC assessment to determine Reyes could still do her past relevant work. Because the ALJ found that Reyes's past jobs did not satisfy the substantial gainful wages requirement, the ALJ determined that Reyes had no past relevant work at step four that could be considered. (Tr. at 42.)

At step five, the ALJ considered Reyes's RFC assessment along with her age, education, and work experience, to determine whether she could make an adjustment to do other work. He found that she could, and therefore, was not disabled. (Tr. at 43.) Specifically, the ALJ reasoned that Reyes's non-exertional limitations for simple, routine, repetitive tasks were within the realm of unskilled work activity according to the Medical Vocational Guidelines set forth by the SSA. (*Id.*) Thus, her limitations did not significantly erode the medium job base because there existed a significant number of jobs in the national economy that Reyes was capable of performing at the medium exertional level. (*Id.*)

**C. Appeals Council Review**

After the ALJ's decision was issued on April 15, 2011, Reyes's request for review by the Appeals Council was denied on April 29, 2011. (Tr. at 1.) Although Reyes submitted additional evidence on appeal, the Appeals Council did not find a reason that warranted a review of the ALJ's decision. (*Id.* at 1-5.)

## III. DISCUSSION

### A. Standard of Review

Judicial review is limited to determining whether the Commissioner applied the correct legal principles in making a decision and, if so, whether the decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989); *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987); *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984); *Richardson v. Perales,* U.S. 389, 401 (1971). Therefore, the reviewing court does not review *de novo* whether a claimant is disabled. *Pratts v. Charter*, 94 F.3d 34, 27 (2d Cir. 1996); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991).

An ALJ's failure to apply the correct legal standard constitutes reversible error when the failure may have "affected the disposition of the case." *Pollard v. Halter,* 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). In such a case, the court may remand the matter to the Commissioner under 42 U.S.C. § 405(g), if it is deemed necessary to allow the ALJ to develop a full and fair record to explain his reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Atartone v. Aplel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)). If the reviewing court finds that the ALJ applied the correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla." *Richardson,* 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct.

206, 83 L. Ed. 126 (1938)).  The substantial evidence standard applies to findings of fact as well

as inferences and conclusions drawn from such facts.  *Marrero v. Apfel*, 87 F. Supp. 2d 340, 345

(S.D.N.Y. 2000); *Smith v. Shalala*, 856 F. Supp. 118, 121 (E.D.N.Y. 1994).  If the

Commissioner's decision that a claimant is not disabled is supported by substantial evidence in

the record, the Court must uphold the decision.  42 U.S.C. § 405(g); *Jones,* 949 F.2d at 59;

*Arnone*, 882 F.2d at 37.  The Court must uphold a denial of benefits supported by substantial

evidence even where substantial evidence may also support the plaintiff's position, *Alston v.*

*Sullivan,* 904 F.2d 122, 126 (2d Cir. 1990), or where a reviewing court's independent conclusion

based on the evidence may differ from the Commissioner's.  *Rutherford v. Schweiker*, 685 F.2d

60, 62 (2d Cir. 1982), *cert. denied,* 459 U.S. § 1212(193); *Schauer v. Schweiker*, 675 F.2d 55, 57

(2d Cir. 1982).  While the ALJ must set forth the essential considerations with sufficient

specificity to enable the reviewing court to determine whether the decision is supported by

substantial evidence, he need not "explicitly reconcile every conflicting shred of medical

testimony."  *Mongeur v. Heckler,* 722 F.2d 1033, 1040 (2d Cir. 1983) (citing *Miles v. Harris,*

645 F.2d 122, 124 (2d Cir. 1981)).  A reviewing court gives deference to the ALJ's evaluation

since he observed the claimant's demeanor and heard the testimony firsthand.  *Pena v. Chater*,

968 F. Supp. 930, 938 (S.D.N.Y. 1997), *aff'd sub nom. Pena v. Apfel,* 141 F.3d 1152 (2d Cir.

1998) (citing *Mejias v. Soc. Sec. Admin.,* 445 F. Supp. 741, 744 (S.D.N.Y. 1978)).

## B. Determination of Disability

### 1. Evaluation of Disability Claims

Under the Social Security Act, each person who is considered to be "disabled" is entitled

to disability insurance benefits.  42 U.S.C. § 423(a)(1).  The Act's definition of disability for the

purposes of disability insurance is substantially similar to SSI.  *Hankerson v. Harris*, 636 F.2d

893, 895 (2d Cir. 1980). A person is considered disabled when she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997). Establishing the mere presence of an impairment is not sufficient for a finding of disability; the impairment must cause severe functional limitations that prevent a claimant from engaging in any substantial gainful activity. 42 U.S.C. § 432(d)(2); *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999). If a claimant is able to engage in his previous work or other substantial gainful work, regardless of whether such work exists in the immediate area where she lives, whether a vacancy exists, or whether she would be hired for such work, she will not be found disabled under the Act. *See* 42 U.S.C. §§ 423(d)(2)(A), and 1382c(a)(3)(B). For the individual to be found disabled, both the medical condition and the inability to engage in gainful activity must last for at least twelve months. *See Barnhart v. Walton*, 535 U.S. 212, 217–22, 122 S.Ct. 1265, 152 L. Ed. 2d 330 (2002).

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step sequential analysis: (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits her ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations; if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the RFC to perform her past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work.

20 C.F.R. § 404.1520; *Rosa,* 168 F.3d at 77; *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999).

The listed impairments are composed of a set of symptoms and a set of functional limitations resulting from those symptoms. C.F.R. Part 404, Subpart P, Appendix 1. If a claimant's impairment is found to satisfy the required criteria of a listed impairment, it is considered severe enough to direct a finding of disability, and ends the sequential evaluation process. 20 C.F.R. § 416.920(a)(4)(iii). The Commissioner must assess the claimant's RFC to apply the fourth and fifth steps of the inquiry. A claimant's RFC represents the most that claimant can do despite her limitations. 20 C.F.R. § 416.945(a). The Commissioner must consider objective medical facts, diagnoses and medical opinions based on such facts, subjective evidence of claimant's symptoms, as well as claimant's age, education, and work history. *Echevarria v. Apfel*, 46 F. Supp. 2d 282, 291 (S.D.N.Y. 1999); *Mongeur,* 722 F.2d at 1037 (citing *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)); 20 C.F.R. § 404.1526(b). To properly evaluate a claimant's RFC, the ALJ must assess the claimant's exertional capabilities, addressing her ability to sit stand, walk, lift, carry, push, and pull. 20 C.F.R. §§ 404.1545(b), 404.1569(a). The ALJ is also required to evaluate the claimant's non-exertional limitations, including depression, nervousness, and anxiety. 20 C.F.R. §§ 404.1545(b), 404.1569(a).

The claimant bears the burden as to the first four steps of the analysis, while the Commissioner has the burden of proving the fifth step. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). A claimant's own testimony regarding her daily activities often supports a finding that the claimant is capable of performing gainful activity. *See Pena*, 968 F. Supp. at 938. If the claimant can establish that her severe impairment prevents her from returning to her previous work, the burden shifts to the Commissioner to demonstrate that the claimant retains the

RFC to perform alternative substantial gainful activity which exists in the national economy. *Gonzalez*, 61 F. Supp. 2d at 29.

In addition, the Commissioner considers the claimant's statements regarding pain and other symptoms, but this alone will not establish disability. 20 C.F.R. § 404.1529(a). Medical findings must support the conclusion that the claimant suffers from an impairment which could "reasonably be expected to produce the pain or other symptoms alleged by the claimant, and which, when considered with all other evidence, would lead to the conclusion that the individual is under a disability." *See* 20 C.F.R. §§ 404.1529, 416.929. If the claimant's symptoms suggest a greater impairment than can be shown by objective evidence alone, other factors should be considered. *Echevarria*, 46 F. Supp. 2d at 292. These factors can include: (1) the person's daily activities; (2) the location, duration, frequency, and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and adverse side effects of medication taken by the individual to alleviate pain or symptoms; (5) treatment, other than medication used to relieve pain; and (6) any other measures that the person uses or has used to relieve the pain or symptoms. 20 C.F.R. §§ 404. 1529(c)(3), 416.929(c)(3). The ALJ may reject claims of severe and disabling pain after weighing medical evidence in the record, the claimant's demeanor, and other indicia of credibility. *See* Soc. Sec. Rul. 96–7p, 61 Fed.Reg. 34, 483 (1996), 1996 WL 374186 (S.S.A); *Aponte v. Sec'y, Dep't of Health & Human Services*, 728 F.2d 588, 591–92 (2d Cir. 1984). The ALJ, however, must give reasons "with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." *Echevarria*, 46 F. Supp. 2d at 292; *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984); *see Lugo v. Apfel*, 20 F. Supp. 2d 662, 663–64 (S.D.N.Y. 1998).

**2. The Treating Physician Rule**

The opinion of a claimant's treating physician is generally given more weight than the opinion of a consultative physician because the treating physician is likely "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (discussing the "treating physician rule of deference"). A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must attempt to fill any clear gaps in the administrative record, especially where the claimant's hearing testimony suggests that the ALJ is missing records from a treating physician. *Burgess,* 537 F.3d at 139.

Second, the ALJ must explicitly consider various factors to determine how much weight to give to the opinion of a treating physician. *Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2)). These factors include: (1) the length, nature, and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2) (i-ii) & (c) (3–6).

Third, the ALJ is required to explain the weight ultimately given to the opinion of a treating physician. *See* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician

is a ground for remand. *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998); *see also Halloran*, 362 F.3d at 32 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Reasons that are conclusory fail the "good reasons" requirement. *Gunter v. Comm'r of Soc. Sec.*, 361 Fed. Appx. 197, 199 (2d Cir. 2012) (finding reversible error where an ALJ failed to explain his determination not to credit the treating physician's opinion). The ALJ is not permitted to arbitrarily substitute his own judgment of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d at 81.

## C. Issues Before This Court

Reyes argues that the ALJ: (1) erred by failing to obtain a vocational expert's testimony in assessing her ability to perform other work in the national economy because she had non-exertional limitations that significantly limited her range of work; (2) improperly applied the treating physician rule by failing to consider all of the required factors, and thus failed to give proper weight to her treating physicians; and (3) failed to provide his reasoning in making his finding at step three that her impairments did not meet or medically equal one of the listed impairments. (Pl. Mot. at 16–22.)

### 1. This Case Should Be Remanded for Further Administrative Proceedings

#### a. The ALJ erred at step five by failing to obtain a vocational expert

The claimant bears the burden of proof as to the first four steps of the analysis, while the Commissioner has the burden of proving the fifth step. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). In most circumstances, the Commissioner is able to meet his burden at step five by relying on the medical vocational guidelines in 20 C.F.R. Part 404, Subpart P, Appendix 2

("grids") to show that the claimant can perform alternate substantial gainful work.  Nevertheless, "if a claimant's non-exertional impairments[22] 'significantly limit the range of work permitted by his exertional limitations'. . . the application of the grids is inappropriate" and a vocational expert is required. *Bapp v. Bowen,* 802 F.2d 605, 606 (2d Cir. 1986).  A non-exertional impairment is significantly diminishing if it is non-negligible. *Bapp,* 802 F.2d at 605-06.  A non-exertional impairment is non-negligible when it "so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013) (quoting *Zabala v. Astrue*, 595 F.3d at 411 (2d Cir. 2010)).  Here, the ALJ relied on Dr. Bougakov's findings contained in his psychiatric examination report to determine that Reyes's non-exertional limitations restricted her to "simple, routine, repetitive tasks," which did not significantly limit her ability to perform unskilled work activity, and therefore, had "little or no effect on the occupational base of unskilled medium work" and did not "significantly erode the medium job base."  (Tr. at 43.)

Reyes argues that, even if the ALJ was correct in relying solely on Dr. Bougakov's findings, the ALJ failed to consider all of the limitations included in his report, and failed to use a vocational expert with all the limitations identified by the doctor.  (Pl. Mem. at 20.)  If an ALJ properly concludes that a claimant's non-exertional limitations do not significantly limit the claimant's ability to work, then a vocational expert is unnecessary. *Acevedo v. Astrue,* 2012 WL 4377323, at *14 (S.D.N.Y. Sept. 4, 2012); *see Tucker v. Heckler*, 776 F.2d 793, 796 (8th Cir. 1985) (finding that failure to obtain a vocational expert did not constitute a reversible error

---

[22] A "non-exertional limitation" is a limitation or restriction imposed by impairments and related symptoms that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404,1569a(c), 416.969a(c).  "Non-exertional limitations" include, among other impairments, most mental impairments, like depression, anxiety, and inability to concentrate. 20 C.F.R. § 404.1569a(c) (1); *see* SSR 85–15, 1985 WL 56857, at *2 (1985).

where there was substantial evidence to support the ALJ's finding that the claimant's non-exertional limitations did not significantly limit his work capacity). Thus, this Court must determine whether there is substantial evidence in the record to support the ALJ's conclusion. *Acevedo* 2012 WL 4377323, at *14.

In *Acevedo*, the court remanded because the evidence "[did] not demonstrate that [the claimant's] capacity to work [was] not significantly limited by her mental impairments." *Id.* at *15. Therefore, the Commissioner failed to satisfy her burden of proof in showing that the claimant could perform other work. The court held that the ALJ had committed legal error by failing to obtain a vocational expert and ordered that one be consulted in reconsidering whether the claimant could perform other work. *Id.* at *15-17. The ALJ also had determined that the claimant in *Acevedo* was capable of performing simple, repetitive tasks based on Dr. Bougakov's[23] findings that the claimant was "capable of 'maintain[ing] attention and concentration and . . . a regular schedule on a limited basis and that [she was] able to make appropriate decisions, relate adequately with others and deal with stress on a limited basis." *Id.* at *15. The ALJ in *Acevedo* had also relied on an RFC assessment from a different doctor stating that the claimant could "learn new tasks, accept supervision, make simple decisions or adapt to changes in her routine." *Id.* The court found that, even if it credited the evidence cited by the ALJ, such evidence was nonetheless insufficient because it failed to demonstrate that the claimant's capacity to work was not significantly limited by her mental impairments, "especially in light of the other evidence in the record that suggested that Acevedo had chronic depression and anxiety disorder." *Id.* Based on the evidence in the record, the court found that it was "not

---

[23] Dr. Bougakov in the instant case is the same doctor referred to in *Acevedo*.

clear . . . that Acevedo's impairments are only negligible or that she still possesses a wide range
of possible employment opportunities." *Id.*

The ALJ in this case relied on similar findings as in *Acevedo* and the findings herein
suffer from the same problems. These findings do not prove that Reyes's non-exertional
limitations are not a significant limitation on her capacity to work. Here, Dr. Bougakov also
included in his report that Reyes can "deal with stress on a limited basis," "*possibl[y]* maintain a
regular schedule," and "learn new tasks on a limited basis." (Tr. at 471. (emphasis added))
According to these findings, the extent of Reyes's limitation in her ability to learn new tasks or
deal with stress is not clear. While it is possible that she may be able to maintain a regular
schedule, it is equally possible that she may be completely incapable of maintaining such a
schedule, which would significantly limit her capacity to work. Furthermore, there is other
evidence from several physicians, which state that Reyes has severe limitations; including Dr.
Kirschtein who found that she was severely limited in her ability to follow work rules, deal with
the public, relate to co-workers, and adapt to stressful situations. (*Id.* at 660.) In Social Security
Ruling 81-15, the SSA promulgated guidelines for assessing the effects of non-exertional
impairments on the occupational base. *See* SSR 81-15p, 1985 WL 56857 (1985) ("Determining
whether these individuals will be able to adapt to the demands or 'stress' of the workplace is
often extremely difficult."). While the presence of non-exertional limitations does not always
require the use of a vocational expert, there is a substantial amount of evidence of significant
limitations in this case, making it unreasonable to allow the ALJ to conclude that Reyes could
perform all medium work without consulting a vocational expert. The Commissioner bears the
burden of proof at this step, and given the plain ambiguity in the medical findings used to
support the ALJ's determination that Reyes could do other work, the Commissioner failed to

meet her burden.  Therefore, I recommend that Reyes's ability to perform other work be
reconsidered with the consultation of a vocational expert in light of her mental limitations.

### b. The ALJ properly applied the Treating Physician Rule

Reyes argues that the ALJ was required to explicitly consider all of the factors set forth in
20 C.F.R. § 404.1527(c)(2), and failed to do so.  Although the ALJ is required to explicitly
consider all of the factors, the ALJ is not required to explicitly "address or recite" each factor in
his decision.  *Marquez v. Colvin,* 2013 WL 5568718, at *12 (S.D.N.Y. Oct. 9, 2013) ("Although
the ALJ did not explicitly recite the factors, his decision nonetheless adequately considered each
factor.").  If it is unclear whether the ALJ explicitly considered all of the factors, the court may
search the record to assure that the treating physician rule has not been traversed, but only when
the ALJ gives good enough reasons to allow the court to engage in such an inquiry.  *Halloran,*
362 F.3d at 32.

In the present case, the ALJ's reasoning in the decision along with the facts in the record
reasonably allow the court to deduce that he considered the treating physician rule even though
he did not explicitly recite each factor.  These factors include: (1) the length, nature, and extent
of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3)
the consistency of the opinion with the entirety of the record; (4) whether the treating physician
is a specialist; and (5) other factors brought to the attention of the ALJ that support or contradict
the opinion.  20 C.F.R. §§ 404.1527(c)(2) (i-ii) & (c) (3–6).

The ALJ acknowledged that Dr. Alayeva, Dr. Gutierrez, and Dr. Gimenez, the treating
physicians in dispute, were psychiatrists, which allows the court to deduce that he considered the
"specialization" factor.  (Tr. at 39, 41)  The ALJ explicitly considered the "length, nature, and
extent of treatment" factor in pointing out the lack of treatment history for each doctor.  Dr.

31

Alayeva saw Reyes two times, and concluded in a report that she had "marked" limitations in her

ability to interact appropriately with supervisors, co-workers, and the public, after only seeing

her once. (*Id.* at 499.) According to the record evidence, Dr. Gutierrez saw Reyes three times,

and opined that she was unable to work after only seeing her twice. (*Id.* at 439, 440, 517.) Dr.

Gimenez saw Reyes once and for only fifteen minutes. (*Id.* at 560-61.) A treating source means

the claimant's own physician who provides the claimant, or has provided the claimant, with

medical treatment or evaluation and who has, or has had, an *ongoing treatment relationship* with

the claimant. 20 C.F.R. § 404.1502; *see also Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir.

2011) (finding that when a physician has only examined a claimant once or twice, "his or her

medical opinion is not entitled to the extra weight of that of a treating physician"). The rationale

for according more weight to a treating physician is that the ongoing relationship presumably

gives the treating physician a deeper understanding of the claimant's impairments. 20 C.F.R.

416.927(c)(2)). Therefore, for the reasons stated above, the ALJ considered the "length, nature,

and extent of treatment" factor and found that it did not merit controlling weight.

The ALJ also considered the "consistency" factor in noting the internal inconsistencies

between Dr. Alayeva's and Dr. Gutierrez's treatment notes and opinions. (Tr. at 41.) At Reyes's

second visit, although visibly sad, Reyes reported feeling better. Also, Dr. Alayeva's clinical

findings remained unchanged from her initial visit, yet Dr. Alayeva rated the degree of Reyes's

limitations more severely, finding in the later visits that she was markedly limited in her ability

to handle detailed work instructions, and that she suffered from repeated episodes of

deterioration or decompensation. (*Id.* at 505-09.) With respect to Dr. Gutierrez, the ALJ found

an inconsistency where Dr. Gutierrez noted that it was too early for Reyes to respond to

treatment and that she was feeling less anxious, while on the same day stating that Reyes was

unable to work for twelve months. Dr. Gutierrez noted on her last visit that Reyes was

"stabilizing" and was feeling less depressed, smiling rather broadly, and appeared more

animated. (*Id.* at 440.) Therefore, the ALJ considered the "consistency" factor and found that it

did not merit controlling weight.

 Although the ALJ did not explicitly state the "supportability" factor, this factor was not a

favorable one to Reyes because the record evidence shows that Reyes's treating physicians did

not have a level of supporting evidence to suggest giving their opinions more weight. The more

a medical source presents relevant evidence to support an opinion, particularly medical signs and

laboratory findings, the more weight that opinion will receive. 20 C.F.R. § 401.1527(c)(3). The

ALJ's finding that the treating physicians' treatment notes were incongruent with their opinions,

along with the lack of treatment history is enough to reasonably deduce that the "supportability"

factor was considered, and furthermore, that the treating physician rule was not traversed. If

there is substantial evidence to support an ALJ's finding, the court must uphold it even though

substantial evidence may exist to support the claimant's position. 42 U.S.C. § 405(g); *Jones,* 949

F.2d at 59; *Arnone*, 882 F.2d at 37; *Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir. 1990).

 For the reasons stated above, the facts in the record along with the ALJ's reasoning in his

decision reasonably allow the court to deduce the treating physician rule was not traversed. I,

therefore, recommend that the treating physician rule was properly applied.

### c. The ALJ provided sufficient reasoning for step three of his analysis

 At step three of the sequential evaluation process, the ALJ was required to determine

whether Reyes had an impairment that was medically severe enough to meet or medically equal

one of the listed impairments found in C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §

416.920(a)(4)(iii). When evaluating mental impairments, SSA regulations require that they be

evaluated by comparing the medical findings concerning the claimant's impairments, and the degree of functional limitation resulting from these impairments, to the criteria of the relevant listed mental disorder.  20 C.F.R. § 416.920a(d)(2).

The degree of functional limitation resulting from the impairment must be based on the extent to which the impairment interferes with the claimant's ability to function independently, appropriately, effectively, and on a sustained basis.  20 C.F.R. § 416.920a(c)(2).  Furthermore, the degree of the claimant's functional limitation is rated under four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  20 C.F.R. § 416.920a(c)(3).  When rating the degree of functional limitation, the following five-point scale is used: none, mild, moderate, marked, and extreme.  20 C.F.R. § 416.920a(c)(4).[24]

If the claimant is found to have an impairment that meets or medically equals one of the listed impairments in C.F.R. Part 404, Subpart P, Appendix 1, the claimant shall be found disabled.  20 C.F.R. § 416.920(a)(4)(iii).  An impairment is found to meet or medically equal one of the listed impairments if it satisfies both "Paragraph A" criteria (a set of medical findings) and "Paragraph B" criteria (a set of impairment-related functional limitations).[25]  The relevant listings[26] considered here were §12.04, affective disorders, and §12.06, anxiety-related disorders.

The ALJ determined that the "Paragraph B" criteria were not met for either listing.  In order to satisfy "Paragraph B" criteria, the symptom(s) must result in at least two of the

---

[24] The category titled, "episodes of decompensation" is rated according to the following four-point scale: none, one or two, three, four or more.  20 C.F.R. § 416.920(c)(4).

[25] When assessing §12.04 and §12.06, Paragraph C criteria is assessed only if Paragraph B criteria is not satisfied, however, Reyes conceded that such criteria is not applicable to her case, and therefore it is not discussed.

[26] The ALJ also considered listings 4.00 and 9.00, but determined that they were not satisfied.  This finding is not in dispute and therefore is not discussed.

following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. C.F.R. Part 404, Subpart P, Appendix 1. The criteria used to determine whether a mental impairment is severe enough to satisfy a listed impairment are the same criteria used to assess a mental RFC, but the RFC assessment requires a more detailed consideration. *See* SSR 85–16, 1985 WL 56855 (1985).

In his RFC analysis, the ALJ considered Reyes's statements at her FEGS evaluation where she reported being able to clean, do laundry, shop, and cook, which pertains to activities of daily living. (Tr. at 39, 403.) The ALJ also considered Dr. Bougakov's findings that Reyes had "mildly" impaired attention, concentration, and memory capacity, which addresses the "concentration, persistence, or pace" category. (*Id.* at 40, 471.) Although their opinions were given little weight, the ALJ considered Reyes's treating physicians' opinions which contained detailed findings concerning Reyes's ability to perform specific activities within the broader categories found in "Paragraph B." (*See id.* at 41.) Moreover, the ALJ did not find any evidence that Reyes experienced "episodes of decompensation, which have been of extended duration." (*Id.* at 38.) Where the ALJ's rationale can be gleaned from the record, the ALJ is not required to explain why he considered particular evidence unpersuasive or insufficient. *Mongeur,* 722 F.2d at 1040. Because the ALJ's reasoning behind Reyes's RFC assessment reflected the same reasoning he used in assessing the presence of "Paragraph B" criteria, the ALJ was not required to provide the same reasoning twice. Where the court cannot fathom the ALJ's rationale in relation to evidence in the record, it will remand for further findings or clearer explanations, but it will not remand where it can look to other portions of the ALJ's decision and to clearly

credible evidence in finding that his determination was supported by substantial evidence. *Mongeur,* 722 F.2d at 1040 (citing *Berry v. Schweiker,* 675 F.2d 464, 469 (2d Cir. 1982)). Because the reasoning behind the RFC assessment encompassed the reasoning behind the step three analysis, the ALJ's explanation at step three was adequate. I, therefore, recommend that the ALJ's finding at step three was supported by substantial evidence.

## D. Remedy

Under 42 U.S.C. § 405(g), the District Court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding for a rehearing. Remand may be appropriate if "the ALJ has applied an improper legal standard." *Rosa v. Callahan,* 168 F.2d 72, 82–83 (2d Cir. 1999). Moreover, where an ALJ has committed a legal error that may have affected the disposition of the case, such a failure constitutes a reversible error. *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004). Here, because the evidence fails to demonstrate that Reyes's capacity to do other work was not significantly limited by her mental impairments, the Commissioner failed to meet her burden in showing that Reyes could do other work, and thus, the ALJ committed legal error by failing to obtain a vocational expert. For this reason, I recommend remand.

## IV. CONCLUSION

For the reasons set forth above, I recommend that Reyes's motion be **GRANTED**, the Commissioner's motion be **DENIED**, and that the case be **REMANDED** to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings to require the ALJ to consult with a vocational expert in reconsidering whether Reyes is capable of performing other work in light of her mental limitations, and in accordance with 20 C.F.R. § 404.1520. Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the Parties shall have fourteen days after being served with a copy of the recommended disposition to file written

objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of

the Court and served on all adversaries, with extra copies delivered to the chambers of the

Honorable William H. Pauley, 500 Pearl Street, Room 1920, and to chambers of the

undersigned, 500 Pearl Street, Room 1970.  Failure to file timely objections shall constitute a

waiver of those objections in both the District Court and on later appeal to the United States

Court of Appeals.  *See Thomas v. Arn,* 746 U.S. 140, 150 (1985); *Small v. Sec'y of Health &*

*Human Servs.,* 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P.

72, 6(a), 6(d).

**DATED: December 19, 2014**
**New York, New York**

                                             **Respectfully Submitted,**

                                             **The Honorable Ronald L. Ellis**
                                             **United States Magistrate Judge**